M. Anderson Berry (SBN 262879)
*anderson@emeryreddy.com*
Gregory Haroutunian (SBN 330263)
*gregory@emeryreddy.com*
**EMERY | REDDY, PLLC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Tel: (916) 995-5968

Thomas J. McKenna*
Gregory M. Egleston*
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
*tjmckenna@gme-law.com*
*gegleston@gme-law.com*

**Pro Hac Vice forthcoming*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIC YOST, Derivatively on Behalf of RXSIGHT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RON KURTZ, SHELLEY THUNEN, J. ANDY CORLEY, WILLIAM J. LINK, JULIET TAMMENOMS BAKKER, ROBERT WARNER, JULIE B. ANDREWS, ROBERT J. PALMISANO, SHWETA SINGH MANIAR, and TAMARA R. FOUNTAIN,<br><br>Defendants,<br><br>and,<br><br>RXSIGHT, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Eric Yost ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of RxSight, Inc., ("RxSight" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts

with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant RxSight*** is a Delaware corporation with its principal executive offices located at 100 Columbia, Aliso Viejo, California 92656. RxSight's common stock is traded on the NASDAQ under the ticker symbol "RXST."

### Director Defendants

8. ***Defendant Ron Kurtz*** ("Kurtz") has served as President, Chief Executive Officer ("CEO"), and a director of the Company since 2016. According to the Company's proxy statement filed with the SEC on a Schedule 14A on April 21,

2025 (the "2025 Proxy"), Defendant Kurtz received $6,982,453 in total compensation from the Company in 2024.

9. ***Defendant J. Andy Corley*** ("Corley") has served as a director of the Company since January 2015 and as Chairman of the Board since July 2015. Defendant Corley also serves as a member of the Company's Compensation Committee and Corporate Governance and Nominating Committee (the "Governance Committee"). According to the 2025 Proxy, Defendant Corley received $262,445 in total compensation from the Company in 2024.

10. ***Defendant William J. Link*** ("Link") has served as a director of the Company since November 2016. According to the 2025 Proxy, Defendant Link received $201,195 in compensation from the Company in 2024.

11. ***Defendant Juliet Tammenoms Bakker*** ("Bakker") has served as a director of the Company since June 2015. Defendant Bakker also serves as a member of the Company's Audit Committee and Governance Committee. According to the 2025 Proxy, Defendant Bakker received $214,945 in compensation from the Company in 2024.

12. ***Defendant Robert Warner*** ("Warner") has served as a director of the Company since August 2021. Defendant Warner also serves as Chair of the Company's Governance Committee and as a member of the Company's Compensation Committee. According to the 2025 Proxy, Defendant Warner received $217,445 in compensation from the Company in 2024.

13. ***Defendant Julie B. Andrews*** ("Andrews") has served as a director of the Company since August 2021. Defendant Andrews also serves as Chair of the Company's Audit Committee. According to the 2025 Proxy, Defendant Andrews received $219,945 in compensation from the Company in 2024.

14. ***Defendant Robert J. Palmisano*** ("Palmisano") has served as a director of the Company since August 2021. Defendant Palmisano also serves as Chair of the Company's Compensation Committee. According to the 2025 Proxy, Defendant

Palmisano received $214,945 in compensation from the Company in 2024.

15. ***Defendant Shweta Singh Maniar*** ("Maniar") has served as a director of the Company since December 2021. Defendant Maniar also serves as a member of the Company's Governance Committee. According to the 2025 Proxy, Defendant Maniar received $204,945 in compensation from the Company in 2024.

16. ***Defendant Tamara R. Fountain*** ("Fountain") has served as a director of the Company since January 2022. Defendant Fountain also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Fountain received $209,945 in compensation from the Company in 2024.

17. Defendants Kurtz, Corley, Link, Bakker, Waner, Andrews, Palmisano, Maniar, and Fountain are collectively referred to as the "Director Defendants."

**<u>Officer Defendants</u>**

18. ***Defendant Shelley Thunen*** ("Thunen") has served as the Chief Financial Officer ("CFO") of the Company since February 2017. Defendant Thunen previously served as Chief Administrative Officer of the Company from January 2016 until February 2017. According to the 2025 Proxy, Defendant Thunen received $5,796,727 in total compensation from the Company in 2024.

19. Defendant Thunen together with Defendant Kurtz are collectively referred to herein as the "Officer Defendants."

20. The Director Defendants and the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## **<u>BACKGROUND</u>**

21. RxSight is a commercial-stage medical technology company focused on the research, development, manufacture, and sale of light adjustable intraocular lenses used in cataract surgery in the United States. The Company's proprietary product is the RxSight Light Adjustable Lens system (the "RxSight System"), which includes

the RxSight Light Adjustable Lens ("LAL"),[1] RxSight Light Delivery Device ("LDD"),[2] and accessories.

22. The Company touts the RxSight System as providing "customize[d] and otimize[d] visual acuity for patients." The Company has explained that, with the RxSight System, unlike other premium intraocular lens technologies, after the surgeon implants the LAL as they would in any other cataract procedure, the surgeon determines refractive error with patient input several weeks following surgery, and then uses the LDD to modify the LAL with the precise visual correction needed to achieve the patient's desired vision outcome.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

23. On November 7, 2024, the Company issued a press release announcing its results of operations and financial condition for the three and nine months ended September 30, 2024. The press release touted the Company's financial results and purported strong RxSight system demand, as follows in relevant part:

> **Key Quarterly Highlights**
>
> - Reported third quarter 2024 revenue of $35.3 million, an increase of 59% compared to the third quarter of 2023, reflecting:
>
> - ***The sale of 24,554 Light Adjustable Lenses (LAL™/LAL+™), representing an 80% increase in procedure volume compared to the third quarter of 2023; and***
>
> - ***The sale of 78 Light Delivery Devices (LDD™s), representing a 18% increase in unit sales compared to the third quarter of 2023 and expanding the installed base to 888 LDDs at the end of the***

[1] The Company's LAL is a premium intraocular lens made of proprietary photosensitive material that changes shape in response to specific patterns of ultraviolet light generated by the RxSight LLD.

[2] The LDD is a specially designed machine for delivering light to the eye.

> ***quarter, representing a 51% increase compared to the end of the third quarter of 2023.***
>
> - The company raised its 2024 full-year revenue guidance to the top of its previous guidance range, increased its gross margin guidance and lowered its operating expense guidance.
>
> ***"We are pleased to report another strong quarter driven by ongoing demand and enthusiasm for the RxSight system,"*** said Dr. Ron Kurtz, Chief Executive Officer and President. "With 78 LDDs sold this quarter and ***sustained growth in LAL sales,*** we continue to see recognition of the transformative power of adjustability and the significant value It provides to both patients and doctors. We believe our third-quarter results position us for a strong finish to 2024 and for continued success in the years to come."
>
> **Third Quarter Financial Results**
>
> In the third quarter of 2024, total revenue was $35.3 million, an increase of 59% compared to $22.2 million in the third quarter of 2023. Revenue growth was driven by a 79% increase in LAL revenue and a 28% increase in LDD revenue, compared to the third quarter of 2023. Gross profit for the third quarter of 2024 was $25.2 million or 71.4% of revenue, an increase of $11.5 million or 84% compared to gross profit of $13.7 million or 61.9% of revenue for the third quarter of 2023. The year over year increase in gross profit was driven by continued growth in the percentage of LAL sales as a proportion of total sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability for company's capital equipment.

24. Also on November 7, 2024, the Company submitted its quarterly report for the period ended September 30, 2024, on a Form 10-Q filed with the SEC (the "3Q24 10-Q"). The 3Q24 10-Q was signed and authorized by the Officer Defendants and also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), also signed by the Officer Defendants.

25. The 3Q24 10-Q affirmed the previously reported financial results. The 3Q24 10-Q further reported the Company's key business metrics including the

purported indicators of its "ability to drive adoption and generate revenue." Specifically, the 3Q24 10-Q stated as follows, in relevant part:

**Key business metrics**

We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. ***We believe the number of LDDs installed and LALs implanted are indicators of our ability to drive adoption and generate revenue.*** We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric ***indicative of adoption and utilization of our RxSight system.***

| | 2024 | | | 2023 | | | |
|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q1 | Q2 | Q3 | Q4 |
| LDDs Sold | 66 | 78 | 78 | 56 | 67 | 66 | 77 |
| Installed Base at End of Period | 732 | 810 | 888 | 456 | 523 | 589 | 666 |

| | 2024 | | | 2023 | | | |
|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q1 | Q2 | Q3 | Q4 |
| LALs Sold | 20,218 | 24,214 | 24,554 | 10,523 | 12,622 | 13,657 | 18,071 |

During the quarter ended September 30, 2024, we had increased LDD sales of 12 and increased LAL sales of 10,897 when compared to the quarter ended September 30, 2023 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.

Our quarterly and annual financial results may fluctuate as a result of a variety of factors many of which are outside our control. We may not yet be able to accurately assess seasonality and other trends, and we will continue to evaluate our business in the future using these and other financial metrics as we observe trends in our business.

* * *

> ***Sales***
>
> Sales increased by $13.1 million, or 59.1%, to $35.4 million for the three months ended September 30, 2024, from $22.2 million for the three months ended September 30, 2023. The increase in total sales was primarily due to the incremental sales of 10,897 LALs and 12 LDDs from strong adoption of our RxSight system by practices and doctors.

26. The 3Q24 10-Q further purported to warn of risks which "may" or "could" negatively impact the Company, including those related to demand, as follows in relevant part:

> ***The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors.***
>
> Our success will depend, in part, on the acceptance of our RxSight system as safe, effective and, with respect to doctors, cost-effective.
>
> * * *
>
> ***Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.***
>
> We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers***, we forecast anticipated materials requirements and demand for our products in*** order to predict inventory needs and then place orders with our suppliers based on these predictions.

27. On January 12, 2025, RxSight issued a press release announcing certain preliminary unaudited fourth quarter and full-year 2024 financial and operational results. The press release touted the Company's financial results and alleged strong RxSight system demand, and issued 2025 guidance, as follows in relevant part:

**Preliminary Unaudited Fourt Quarter and Ful-year 2024 Results**

- Preliminary unaudited fourth quarter 2024 revenue is expected to be approximately $40.2 million, representing growth of approximately 41% compared to the prior year period, driven by:

- ***The sale of 29,069 Light Adjustable Lenses (LAL™/LAL+®); representing a 61% increase in procedure volume compared to the fourth quarter of 2023; and***

- ***The sale of 83 Light Delivery Devices (LDD™s), expanding the installed base to 971 LDDs as of December 31, 2024, representing a 46% increase compared to the installed base at end of the fourth quarter of 2023.***

- Preliminary unaudited 2024 fiscal year revenue is expected to be approximately $139.9 million, representing growth of approximately 57% compared to the prior year, driven by:

- The sale of 98,055 LALs; representing a 79% increase in procedure volume compared to 2023; and

- The sale of 305 LDDs.

Preliminary unaudited cash, cash equivalents and short-term investments as of December 31, 2024, is expected to be $237.2 million. "***During the fourth quarter, we achieved record highs for LDD sales and LAL procedures, meaningfully exceeding our initial full-year 2024 revenue guidance.*** With nearly one thousand LDDs installed, we now serve an estimated 15% of cataract surgeons in North America, while LAL

> procedures account for over 10% of the region's premium IOL market. We believe this sustained growth in one of ophthalmology's most competitive segments reflects the growing recognition of the superior visual outcomes enabled by adjustability," said Dr. Ron Kurtz, Chief Executive Officer and President of RxSight. "***In 2025, we expect adoption for the RxSight system to remain strong*** as we collaborate with a diverse range of customers to further expand the infrastructure for postoperative light treatments. Building on our momentum in North America, we also look forward to entering key international markets in Asia and Europe. Finally, leveraging the foundation established since our initial FDA approval, we plan to continue to innovate the RxSight system, that we believe will continue to set the standard for the premium IOL market for years to come."
>
> **2025 Guidance**
>
> ***RxSight anticipates full-year 2025 revenue in the range of $185.0 million to $197.0 million,*** reflecting growth of approximately 32% to 41% over 2024. The company currently estimates the full-year 2025 gross profit margin to be in the 71% to 73% range. In addition, the company expects full-year 2025 operating expenses in the range of $165.0 million to $170.0 million, including non-cash stock-based compensation expense guidance in the range of $22.0 million to $25.0 million.

28. On February 25, 2025, RxSight issued a press release announcing its results of operations and financial condition for the three and twelve months ended December 31, 2024. The press release touted the Company's financial results and alleged strong RxSight system demand, and reiterated 2025 guidance, as follows in relevant part:

> **Key Quarterly and Fully-Year Highlights**
>
> - Recognized fourth quarter 2024 revenue of $40.2 million, an increase of 41% compared to the fourth quarter of 2023, reflecting:

- ***The sale of 29,069 Light Adjustable Lenses (LAL™/LAL+®), representing an 61% increase in procedure volume compared to the fourth quarter of 2023; and***

- ***The sale of 83 Light Delivery Devices (LDD™s), expanding the installed base to 971 LDDs at the end of the quarter, a 46% increase compared to the 666-unit LDD installed base at the end of the fourth quarter of 2023.***

- Recognized full-year 2024 revenue of $139.9 million, a 57% increase over 2023, driven by unit sales of 98,055 LALs and 305 LDDs, representing growth of 79% and 15% respectively, compared to 2023.

* * *

**Fourth Quarter Financial Results**

In the fourth quarter of 2024, total revenue was $40.2 million, an increase of 41% compared to $28.6 million in the fourth quarter of 2023. Revenue growth was driven by a 60% increase in LAL revenue and a 7% increase in LDD revenue, compared to the fourth quarter of 2023.

Gross profit for the fourth quarter of 2024 was $28.8 million or 71.6% of revenue, an increase of $11.1 million compared to gross profit of $17.7 million or 61.8% of revenue for the fourth quarter of 2023. The year over year increase in gross profit was driven by continued growth in the percentage of LAL sales as a proportion of total sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability for company's capital equipment.

* * *

**Fiscal Year 2024 Financial Results**

Full-year 2024 total revenue was $139.9 million, an increase of 57% compared to the full year of 2023. The increase in 2024 revenue was driven by a 78% increase in LAL revenue and 24% increase in LDD revenue compared to 2023.

> Gross profit for the full year of 2024 was $98.9 million, or 70.7% of revenue compared to gross profit of $53.8 million, or 60.4% of revenue for the full year of 2023. The increase in gross profit was due to a favorable product mix from a greater percentage of revenue from LAL sales and increased margins on the LDD introduced during the third quarter of 2023.
>
> * * *
>
> **2025 Guidance**
>
> ***The company is reiterating guidance for the full-year 2025 revenue, gross profit margin, and operating expenses:***
>
> • ***Revenue in the range of $185.0 million to $197.0 million, representing implied growth of approximately 32% to 41% compared to 2024;***
>
> • Gross margin in the range of 71% to 73%, representing an implied increase of 30 bps to 230 bps compared to 2024;
>
> • Operating expenses in the range of $165.0 to $170.0 million, representing an implied increase of 22% to 25% compared to 2024;
>
> • Operating expense guidance also includes non-cash expenses in the range of $22.0 million to $25.0 million.

29. On February 25, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K was signed and authorized by Defendants Kurtz, Thunen, Corley, Link, Bakker, Andrews, Palmisano, Warner, Maniar, and Fountain. The FY24 10-K also contained SOX certifications signed by the Officer Defendants.

30. The FY24 10-K affirmed the previously reported financial results. The FY24 10-K further reported the Company's key business metrics including the purported indicators of its "ability to drive adoption and generate revenue."

Specifically, the FY24 10-K stated as follows, in relevant part:

**Key Business Metrics**

We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. We believe the number of LDDs installed and, LALs implanted are indicators of our ability to drive adoption and generate revenue. We believe these are important metrics for our business. We may not yet be able to accurately assess seasonality and other trends, and we will continue to evaluate our business in the future using these and other financial metrics as we observe trends in our business. Our quarterly and annual financial results may fluctuate as a result of a variety of factors many of which are outside our control. For example, it is not uncommon in our industry to experience seasonally weaker sales during the summer months and end-of-year holiday season. We may be affected by other seasonal trends in the future, including severe weather (which can impact the number of elective procedures performed), particularly as our business matures. Additionally, this seasonality may be reflected to a much lesser extent, and sometimes may not be immediately apparent, in our revenue. To the extent we experience this seasonality, it may cause fluctuations in our operating results and financial metrics and make forecasting our future operating results and financial metrics more difficult.

***We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and utilization of our RxSight system.***

| | 2024 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| LDDs Sold | 66 | 78 | 78 | 83 | 56 | 67 | 66 | 77 |
| Installed Base at End of Period | 732 | 810 | 888 | 971 | 456 | 523 | 589 | 666 |

| | 2024 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| LALs Sold | 20,218 | 24,214 | 24,554 | 29,069 | 10,523 | 12,622 | 13,657 | 18,071 |

> ***During 2024, we had increased LDD sales of 39 and increased LAL sales of 43,182 when compared to 2023 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.***
>
> * * *
>
> ***Sales***
>
> Sales increased by $50.8 million, or 57.1%, to $139.9 million for the year ended December 31, 2024 from $89.1 million for the year ended December 31, 2023. The increase was due to incremental sales of 43,182 LALs primarily due to continued penetration in existing customers, an increased LDD installed base of 305 and incremental sales of 39 LDDs from strong adoption of our RxSight technology by practices and doctors.

31. The FY24 10-K further purported to warn of risks which "may" or "could" negatively impact the Company, including those related to demand, as follows in relevant part:

> ***The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors.***
>
> * * *
>
> For example, some doctors may choose to utilize our RxSight system on only a subset of their total patient population or may not adopt our RxSight system at all. If we are not able to effectively demonstrate that the use of our RxSight system is beneficial in a broad range of patients, adoption of our product will be limited and may not occur as rapidly as we anticipate or at all, which would have a material adverse effect on our business, financial condition and results of operations. We cannot assure you that our products will achieve broad market acceptance among doctors. Additionally, even if our products achieve market acceptance, they may not maintain that market acceptance over time if competing products, procedures or technologies are considered safer or more cost-

effective or otherwise superior. Any failure of our products to generate sufficient demand or to achieve meaningful market acceptance and penetration will harm our future prospects and have a material adverse effect on our business, financial condition and results of operations.

* * *

***Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.***

We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions.

32. That same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the quarter (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Thunen reiterated the Company's "strong" financial results and touted its LDD and LAL sales, stating:

Consistent with our January preannouncement RxSight reported fourth quarter 2024 revenue of $40.2 million, up 41% compared to the year ago quarter. Growth was broad based, driven by strong growth in LAL procedure volume and the continued expansion of our installed base of LDDS.

The positive momentum we saw throughout 2024 remains fueled by surgeons increasing appreciation of the clinical advantage and economic

value of the RxSight system, particularly the benefits of post operative adjustability. LAL sales maintained strong growth in the fourth quarter of 2024, reflecting the increased preference amongst surgeons and patients for the enhanced clinical outcomes offered by our adjustable IOLs.

We sold a record of 29,069 LALs in the period, up 61% from the fourth quarter of 2023. These procedure volumes translated into LAL revenue of $28.5 million in the fourth quarter of 2024, up 60% compared to the year ago quarter.

In the fourth quarter of 2024, we sold 83 LDDs and generated $10.7 million in LDD revenue. We ended 2024 with an LDD installed base of 971 units, up 46% compared to the 666 units installed at the end of 2023. Higher LAL volume in the fourth quarter also led to an increased LAL revenue mix, with LAL revenue accounting for 71% of total revenue, up from 62% in the fourth quarter of 2023. This shift in mix, combined with LDD sales with a lower manufacturing cost and higher average selling price expanded our gross margin to 71.6% in the fourth quarter of 2024, up from 61.8% in the fourth quarter of 2023.

33. On April 2, 2025, RxSight issued a press release announcing certain preliminary unaudited first quarter financial and operational results. The press release touted the Company's financial results and alleged strong RxSight system demand, and issued revised 2025 guidance, as follows:

**Preliminary First Quarter 2025 Results**

• ***Preliminary first quarter 2025 revenue is expected to be approximately $37.9 million, representing growth of 28% compared to the prior year period,*** and a decrease of 6% compared to the fourth quarter of 2024, driven by:

• ***The sale of 27,579 Light Adjustable Lenses*** (LAL™/LAL+®); representing a 36% increase in procedure volume compared to the first quarter of 2024; and

• ***The sale of 73 Light Delivery Devices (LDD™s),*** bringing the installed base to 1,044 LDDs as of March 31, 2025, which represents a 43% expansion compared to the installed base of 732 LDDs at end of the first quarter of 2024.

* * *

**Revised 2025 Guidance**

The company decreased its 2025 full-year revenue and operating expense guidance as follows:

• ***Revenue in the range of $160.0 million to $175.0 million***, a decrease from the previous guidance range of $185.0 million to $197.0 million, representing implied growth of 14% to 25% compared to 2024;

• Operating expenses in the range of $150.0 to $160.0 million, a decrease from the previous guidance range of $165.0 million to $170.0 million and now representing an implied increase of 10% to 18% compared to 2024;

34. On April 21, 2025, the Director Defendants filed the 2025 Proxy Statement on Schedule 14A with the SEC. The 2025 Proxy Statement included a section titled "2024 Business Highlights," wherein the Company touted its LAL and LDD sales for the year. Specifically, the 2025 Proxy Statement stated:

***2024 Business Highlights***

• The sale of 98,055 LALs in 2024, representing a 79% increase in procedure volume as compared to 2023.

• The sale of 305 LDDs in 2024, representing a 15% increase in unit sales compared to 2023 and expanding the installed base to 971 LDDs at the end of 2024, representing a 46% increase compared to the end of 2023.

• Sales for 2024 were $139.9 million, an increase of $50.9 million or 57%, compared to 2023.

• Gross profit for 2024 was $98.9 million, an increase of $45.2 million or 84%, compared to 2023.

• Gross margin for 2024 increased to 70.7% compared to 60.4% in 2023, primarily due to the increased proportion of LAL sales to total sales, lower LDD material costs, and an increase in average LDD selling price.
. . .

35. The foregoing statements in the 2025 Proxy Statement were materially false and misleading it concealed from investors that: (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company's statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

36. Indeed, by choosing to speak about the Company's sales and financial results, the Director Defendants were also required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Director Defendants' failure to disclose the foregoing issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. 17 C.F.R. § 229.303.

37. The 2025 Proxy Statement assured investors that the Company was effectively overseeing risks to the Company, stating:

**Role of the Board in risk oversight**

Our Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board of Directors is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks and operational risks. The Compensation Committee is responsible for

> overseeing the management of risks relating to our executive compensation plans and arrangements. The Audit Committee is responsible for overseeing the management of risks relating to accounting matters, financial reporting, internal controls over financial reporting, and cybersecurity. Our Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with Board organization, composition, membership and structure, corporate governance and board performance. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks. Our Board believes its administration of its risk oversight function has not negatively affected our Board's leadership structure.

38. Despite this assurance, the Board was not in fact fulfilling its oversight responsibilities as, contrary to the Director Defendants' representations, (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company's statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis. Thus, it was known, or should have been known, to the Director Defendants in the exercise of prudent business judgment that the Board was not exercising adequate risk oversight. As such, the foregoing statement in the 2025 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

39. On the basis of the foregoing false and misleading statements in the 2025 Proxy Statement, shareholders voted in favor of, *inter alia*, the reelection of Defendants Kurtz, Corley, and Bakker to the Board, thereby enabling them to

continue breaching their fiduciary duties to the Company as alleged herein, which led to the Company suffering harm.

40. On May 7, 2025, RxSight issued a press release announcing its results of operations and financial condition for the three ended March 31, 2025. The press release touted the Company's financial results and alleged strong RxSight system demand, and reiterated the Company's 2025 guidance, as follows in relevant part:

> **Key Quarterly Highlights**
>
> • ***Reported first quarter 2025 revenue of $37.9 million***, an increase of 28% compared to the first quarter of 2024, reflecting:
>
> • ***The sale of 27,579 Light Adjustable Lenses*** (LAL®/LAL+®), representing a 36% increase in procedure volume compared to the first quarter of 2024;
>
> • ***The sale of 73 Light Delivery Devices*** (LDD™s), bringing the installed base to 1,044 LDDs as of March 31, 2025, which represents a 43% expansion compared to the installed base of 732 LDDs at end of the first quarter of 2024; and
>
> • The company reiterated its 2025 full-year revenue, gross margin and operating expense guidance.
>
> ***"The exceptional clinical value delivered by our Light Adjustable Lens continues to drive significant enthusiasm among cataract surgeons,"*** said Ron Kurtz, Chief Executive Officer and President of RxSight. "The excitement and engagement we observed at the recent ASCRS meeting further reinforces our conviction that customization and post-operative adjustability are shaping the future of premium cataract surgery. ***Supported by strong customer and patient interest,*** an innovative product pipeline, the expansion of third-party light treatment service center business models, and recent international regulatory approvals, we believe we are well-positioned to lead the next chapter of growth in the premium IOL market."

> **First Quarter Financial Results**
>
> In the first quarter of 2025, total revenue was $37.9 million, an increase of 28% compared to $29.5 million in the first quarter of 2024. Revenue growth was driven by a 37% increase in LAL revenue and an 8% increase in LDD revenue, compared to the first quarter of 2024.
>
> Gross profit for the first quarter of 2025 was $28.3 million or 74.8% of revenue, an increase of $7.6 million compared to gross profit of $20.7 million or 70.1% of revenue for the first quarter of 2024. The lower cost of sales for both the LDD and LAL drove the increase in gross profit in the quarter, along with the favorable shift in product mix toward LAL sales, and sustained pricing stability for company's capital equipment.
>
> * * *
>
> **2025 Guidance**
>
> The company reiterated its 2025 full-year revenue, gross margin and operating expense guidance as follows:
>
> • Revenue of $160.0 million to $175.0 million, representing implied growth of 14% to 25% compared to 2024;
>
> • Gross margin in the range of 71% to 73%, representing an implied increase of 30 basis points to 230 basis points compared to 2024;

41. Also on May 7, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC (the "1Q25 10-Q"). The 1Q25 10-Q was signed and contained SOX certifications by the Officers Defendants.

42. The 1Q25 10-Q affirmed the previously reported financial results. The 1Q25 10-Q further reported the Company's key business metrics including the purported indicators of its "ability to drive adoption and generate revenue." Specifically, the 1Q25 10-Q stated as follows, in relevant part:

**Key business metrics**

We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. ***We believe the number of LDDs installed and LALs implanted are indicators of our ability to drive adoption and generate revenue. We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics*** as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and utilization of our RxSight system.

| | 2025 | 2024 | | | |
|---|---|---|---|---|---|
| | Q1 | Q1 | Q2 | Q3 | Q4 |
| LDDs Sold | 73 | 66 | 78 | 78 | 83 |
| Installed Base at End of Period | 1,044 | 732 | 810 | 888 | 971 |

| | 2025 | 2024 | | | |
|---|---|---|---|---|---|
| | Q1 | Q1 | Q2 | Q3 | Q4 |
| LALs Sold | 27,579 | 20,218 | 24,214 | 24,554 | 29,069 |

***During the quarter ended March 31, 2025, we had increased LDD sales of 7 and increased LAL sales of 7,361*** when compared to the quarter ended March 31, 2024 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.

43. The 1Q25 10-Q further purported to warn of risks which "may" negatively impact the Company, including those related to demand, as follows in relevant part:

***The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors.***

Our success will depend, in part, on the acceptance of our RxSight system as safe, effective and, with respect to doctors, cost-effective. We cannot predict how quickly, if at all, patients, doctors, or payors will accept our RxSight system or, if accepted, how frequently it will be used.

> Our RxSight system and planned or future products we may develop or market may never gain broad market acceptance for some or all of our targeted indications. Patients and doctors must believe that our products offer benefits over alternative treatment methods. To date, a substantial majority of our product sales and revenue have been derived from current customers that have adopted our RxSight system.
>
> * * *
>
> ***Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.***
>
> We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions.

44. That same day, the Company hosted an earnings call for analysts and investors to discuss its financial results for the quarter (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Thunen reiterated the Company's financial performance and touted its sales, stating:

> During the quarter, we sold 27,579 LALs and generated $27.2 million in LAL revenue, up 37% compared to the first quarter of 2024 and down 5% compared to the fourth quarter of 2024.
>
> In the first quarter of this year, LAL revenue represented 72% of total revenue, an increase from 67% and 71% in the first and fourth quarters

> of 2024, respectively. During the first quarter of 2025, we sold 73 LDDs, up 11% compared to the 66 units in the year ago quarter.
>
> On a sequential basis, our LDD units sold during the first quarter were down 12% compared to the seasonally strong capital equipment fourth quarter with the sale of 83 LDDs.
>
> During the quarter, LDD sales generated revenue of $9.4 million, up 8% compared to the first quarter of 2024 and down 12% versus the strong fourth quarter of 2024. As of March 31st, 2025, our LDD installed base stood at 1,044 units, up 43% and 8% versus the first and fourth quarters of 2024, respectively.
>
> Gross margin in the first quarter of 2025 was 74.8% compared to 70.1% and 71.6% in the first and fourth quarters of 2024, respectively. The increased gross margin was primarily due to lower LAL costs and mix. Because we consign LAL inventory, we recognize the LAL cost of goods sold about nine months after we build product.

45. The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company was experiencing "adoption challenges" and/or structural issues resulting in declines in sales and utilization; (ii) the demand for RxSight's products had been overstated; (iii) as a result, RxSight was unlikely to meet its own previously issued financial guidance for fiscal year 2025; and (iv) that, as a result of the foregoing, the foregoing positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

46. On July 8, 2025, after the market closed, RxSight reported preliminary second quarter 2025 financial results, revealing significant declines in LDD sales, LAL utilization, and overall revenue. The Company also lowered its full fiscal year

2025 guidance by approximately $42.5 million at the midpoint. Specifically, the Company issued a press release which stated as follows, in relevant part:

> **Preliminary Second Quarter 2025 Results**
>
> • ***Preliminary second quarter 2025 revenue is expected to be approximately $33.6 million, representing a decrease of 4% compared to the prior year period, and a decrease of 11% compared to the first quarter of 2025, driven by:***
>
> • ***The sale of 27,380 Light Adjustable Lenses (LAL®/LAL+®), representing a 1% decrease in procedure volume compared to the first quarter of 2025 and a 13% increase in procedure volume compared to the second quarter of 2024; and***
>
> • ***The sale of 40 Light Delivery Devices (LDD™s), representing a 45% decrease compared to the first quarter of 2025 and a 49% decrease compared to the second quarter of 2024.***
>
> • As of June 30, 2025, the company's installed base stood at 1,084 LDDs, which represents a 34% expansion compared to the installed base of 810 LDDs at the end of the second quarter of 2024.
>
> * * *
>
> **Revised 2025 Guidance**
>
> The company decreased its 2025 full-year revenue, increased its gross margin percentage and reduced its operating expense guidance as follows:
>
> • Revenue in the range of $120.0 million to $130.0 million, revised downward from the previous guidance range of $160.0 million to $175.0 million, representing an implied decrease of 14% to 7% compared to 2024;
>
> • Gross margin in the range of 72% to 74%, an increase from the previous guidance range of 71% to 73%, and representing an implied increase of 130 basis points to 330 basis points compared to 2024;

47. On the same date, the Company held an earnings call to discuss the second quarter 2025 financial results, during which Defendant Kurtz disclosed "adoption challenges over the last few quarters have been a primary reason for the LDD stall." Specifically, Kurtz stated as follows in relevant part:

> Well, I would say that we generally believe that LDD sales are driven be the previous generation of successful LAL adopters. So it is critical for us going forward to reverse those utilization trends so that we can point to customers who continue to have success and excellent ROI with the LAL. ***And so I do think that the two are linked and that the adoption challenges that we've had over the last few quarters have been a primary underlying reason for the LDD stall.*** There are, as I mentioned, some potential quarterly specific things related to longer capital equipment acquisition times, and we tend to be very back-end loaded. But again, if we focus on the areas that we can accelerate and impact LDD in the long run, we believe that is by accelerating LAL utilization.

48. On this news, RxSight's stock price fell $4.84, or 37.8%, to close at $7.95 per share on July 9, 2025, on unusually heavy trading volume.

## INSIDER TRADING ALLEGATIONS

49. Rather than providing the market with correct information, Defendants Fountain and Maniar (the "Insider Trading Defendants") used their knowledge of RxSight's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As directors of RxSight, the Insider Trading Defendants were privy to material, nonpublic information about, *inter alia*, RxSight's adoption challenges, structural issues, and the Company's sales and financial information.

50. While in possession of this material, non-public knowledge, the Insider Trading Defendants enriched themselves by engaging in insider sales of the Company's shares while those shares traded at artificially high prices.

51. Specifically, on March 12, 2025, while the Company's stock price was artificially inflated, Defendant Fountain sold 7,000 shares of personally held RxSight common stock for total proceeds of almost $180,000.

52. On November 26, 2024 and January 22, 2025, while the Company's stock price was artificially inflated, Defendant Maniar sold approximately 7,301 shares of personally held RxSight common stock for total proceeds of approximately $282,000.

53. As such, the Insider Trading Defendants used their material, non-public information and status as Company insiders to take advantage of the Company's artificially inflated stock price to reap collective gross proceeds in excess of $460,000.

## DAMAGE TO THE COMPANY

**Securities Class Action**

54. On, July 22, 2025, a securities class action complaint was filed in the United States District Court for the Central District of California against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 in the case captioned: *Makaveev v. RxSight, Inc., et al.*, Case No. 8:25-cv-01596 (C.D. Cal.) (the "*Makaveev* Action").

55. On September 16, 2025, a factually related securities class action was filed against the Company and the Officer Defendants in the case captioned: *Gemesi v. RxSight, Inc., et al.*, Case No. 8:25-cv-02093 (C.D. Cal.) ("*Gemesi* Action").

56. On October 6, 2025, the court consolidated the *Makaveev* and *Gemesi* Actions, appointed the Michigan Laborers' Pension Fund as Lead Plaintiff, and designated the caption *In re RxSight, Inc. Securities Litigation*, Case No. 8:25-cv-01596-FWS-KES (C.D. Cal.) (the "Securities Class Action").

57. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant

sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

58. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

59. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

60. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

61. As alleged above, the Insider Trading Defendants, while in possession of material, non-public information, collectively abused their positions as Company insiders, misappropriated the Company's valuable information, and reaped over $460,000 in gross proceeds through their unlawful insider trading which the Company is entitled to disgorge.

**Additional Damage to the Company**

62. As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars.

63. Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

64. In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

65. As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

66. Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

67. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of RxSight, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

68. At all relevant times, the Company maintained a Code of Conduct which applies to "[a]ll directors, officers and employees (who, unless otherwise specified, will be referred to jointly as 'employees') of RxSight, Inc. (together with any subsidiaries, collectively the 'Company'), as well as Company contractors, consultants and agents."

69. In a section entitled "Purpose," the Code of Conduct states:

> This Code of Business Conduct and Ethics (this "Code") is designed to deter wrongdoing and to promote:
>
> 1. fair and accurate financial reporting;
>
> 2. compliance with applicable laws, rules and regulations including, without limitation, full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with, or submit to, the U.S. Securities and Exchange Commission and in the Company's other public communications;
>
> 3. the prompt internal reporting of violations of this Code as set forth in this Code;
>
> 4. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; and
>
> 5. a culture of honesty and accountability.

70. In a section entitled "Financial Reports and Other Records – Disclosure," the Code of Conduct states:

> Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.
>
> Each employee involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

> Employees must maintain all of the Company's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, employees must ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to the Company's system of internal controls. Employees must carefully and properly account for all assets of the Company. Employees may not establish any undisclosed or unrecorded account or fund for any purpose. Employees shall not make any false or misleading entries in the Company's books or records for any reason, or disburse any corporate funds or other corporate property without adequate supporting documentation and authorization. Employees shall not misclassify transactions related to accounts, business units or accounting periods. Each employee bears responsibility for ensuring that they are not party to a false or misleading accounting entry.

71. In a section entitled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

> All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct.
>
> Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility. If a law conflicts with a policy in this Code, employees must comply with the law.
>
> Any questions as to the applicability of any law should be directed to the Compliance Officer. The following is a brief summary of certain topics about which employees should be aware.
>
> * * *
>
> []. <u>Insider Trading</u>. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic

information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information.

* * *

[]. <u>Keeping the Audit Committee Informed</u>. The Audit Committee plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee of the Board of Directors. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

a. the accuracy of material disclosures made by the Company in its public filings;

b. material weaknesses or significant deficiencies in internal control over financial reporting;

c. any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

d. any evidence of a material violation of the policies in this Code regarding financial reporting.

[]. <u>Maintaining and Managing Records</u>. The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. Records include all recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and the Company.

**<u>Audit Committee Charter</u>**

72. At all relevant times, the Company had in place its Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee. Pursuant to the Audit Committee Charter, the Audit Committee's purpose is to: "assist the Board in its oversight of:"

> 1. the accounting and financial reporting processes and internal controls of the Company;
>
> 2. the audit and integrity of the Company's financial statements;
>
> 3. the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);
>
> 4. the qualifications, independence and performance of the Company's independent auditors; and
>
> 5. the implementation and performance of the Company's internal audit function, if applicable.

73. The Audit Committee Charter also sets forth the following "Responsibilities" of the Audit Committee:

> []. <u>Appoint and Oversee Independent Auditor; Approve Audit and Non-Audit Services</u>. The Committee will be directly responsible for appointing, compensating, retaining, evaluating and overseeing an independent registered public accounting firm to act as the Company's independent auditor for the purpose of auditing the Company's financial statements, books, records, accounts and internal control over financial reporting, and, where appropriate, replacing the independent auditor. The Committee shall also appoint, retain, compensate, oversee and, where appropriate, replace any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. Any such appointments or approvals may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to the

Chairperson of the Committee so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

* * *

[]. Review of Internal Controls and Integrity of Financial Statements. The Committee shall periodically meet with management, the internal audit function, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

a. the scope and timing of the annual audit of the Company's financial statements;

b. the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c. the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

d. the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e. the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

f. any major issues regarding accounting principles and financial statement presentations, including any significant changes in the

> Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;
>
> g. any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;
>
> h. the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and
>
> i. any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

* * *

[]. <u>Review of Financial Information Presentation, Earnings Press Release and Guidance</u>. The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies. The Chairperson of the Committee may represent the entire Committee for the purposes of such discussions.

* * *

[]. Conflicts of Interest. The Committee shall review and monitor compliance with the Company's Code of Business Conduct and Ethics and consider questions of actual or possible conflicts of interest of Board members and of corporate officers and approve or prohibit applicable transactions or matters.

* * *

[]. Compliance with Laws. On at least an annual basis, the Committee shall review and discuss with management and the independent auditor (a) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (b) reports regarding compliance with applicable laws, regulations and internal compliance programs. The Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's Chief Financial Officer and/or General Counsel (if one is serving) any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

[]. Enterprise Risk Management. The Committee shall review and discuss with management, including the Company's internal audit function, if applicable, and the Company's independent auditor guidelines and policies to identify, monitor, and address enterprise risks, including those risks related to cybersecurity. This shall include discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. The Committee shall also oversee and monitor management's plans to address such risks. In connection with its review of enterprise risk, management's assessment thereof and any draft risk factors presented by management, the Committee is entitled to rely on management's identification and assessment of the operational, financial, strategic, regulatory and other risks described.

* * *

[]. Report to Full Board. The Committee must review with the full Board any issues that arise regarding: (a) the quality or integrity of the Company's financial statements; (b) the Company's compliance with legal or regulatory requirements; (c) the performance and independence of the Company's independent auditor; and (d) the performance of the internal audit function, if applicable.

## DUTIES OF THE DIRECTOR DEFENDANTS

74. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

75. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

76. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

77. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

78. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such

duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

79. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

80. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

82. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

83. Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

84. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

85. At the time this suit was filed, the Company's Board was comprised of ten (10) members: Defendants Corley, Kurtz, Link, Bakker, Warner, Andrews, Palmisano, Maniar, Fountain, and Non-Party Raymond W. Cohen ("Cohen") (*i.e.*, the "Current Directors"). Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

86. The Current Directors (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

87. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

88. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

89. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii)

remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

90. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

91. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

92. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

93. The Director Defendants also each reviewed, approved, and otherwise solicited the 2025 Proxy Statement which failed to make the required disclosures under Item 303 and also contained the false and misleading half-truths in violation of 17 C.F.R. § 240.12b-20, as alleged *supra*. Due to the Director Defendants' materially false and misleading statements in the 2025 Proxy Statement, the Company's stockholders voted to approve the proposals in the 2025 Proxy Statement, including the re-election of Defendants Kurtz, Corley, and Bakker to the Board, thereby

enabling them to continue breaching their fiduciary duties to the Company. As such, each of the Director Defendants face a substantial likelihood of liability for their role in preparing and soliciting the false and misleading 2025 Proxy Statement.

94. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

95. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Kurtz**

96. Defendant Kurtz is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Kurtz cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

97. As CEO, Defendant Kurtz also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement. As such, Defendant Kurtz could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Kurtz is therefore futile.

98. Defendant Kurtz also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Kurtz is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

99. In addition, Defendant Kurtz receives lucrative compensation in

connection with his employment with the Company. Defendant Kurtz is not independent from Defendants Sewell, Ward, and Sridhar as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Kurtz. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Kurtz could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

100. Because of Defendant Kurtz's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Kurtz is unable to comply with his fiduciary duties and prosecute this action. Defendant Kurtz is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Link**

101. The Company concedes in the 2025 Proxy Statement that "Dr. Link is not 'independent' under Nasdaq rules due to certain payments made by us in 2023 and 2024 to a company in which a trust affiliated with Dr. Link is a significant investor and in which Dr. Link's son-in-law serves as the chief executive officer."

102. Pertinently, according to the 2025 Proxy Statement, the Company "made an aggregate of $821,000 in rebate and commission payments and sold $675,000 of products to Praxis Management, LLC and related Praxis entities, in which a trust affiliated with director William J. Link, Ph.D. is a significant investor and in which Dr. Link's son-in-law serves as the chief executive officer."

103. According to the Company's 2024 proxy statement filed with the SEC on April 25, 2024, the Company made a similar payment to Praxis Management, LLC in 2023.

104. Because of this conflict, as the Company admits, Defendant Link is not independent and cannot, therefore, consider a demand to sue the Individual Defendants which could, in turn, impact on the payments made to the company he is invested in and that his son serves as CEO of.

**Defendants Andrews and Palmisano**

105. Defendants Andrews and Palmisano are irreconcilably conflicted and could not consider a demand to sue one another as a result of their longstanding professional and personal relationship with each other, built upon mutual respect, since at least 2011.

106. Specifically, Defendants Andrews and Palmisano each served in positions at Wright Medical Group N.V. and Wright Medical Group Inc. Defendant Andrews served as Senior Vice President of Global Finance of Wright Group N.V. from August 2019 until December 2020, and Defendant Palmisano served as a member of the board of directors from October 2015 until November 2020. Defendant Palmisano also served as CEO and President of Wright Medical Group Inc. from September 2011 until October 2015, and Defendant Andrews served as Vice President, Chief Accounting Officer of Wright Medical Group, Inc. from May 2012 until September 2019.

**Defendants Palmisano, Link and Kurtz**

107. Defendants Palmisano, Link, and Kurtz are irreconcilably conflicted and could not consider a demand to sue one another (or a demand to sue Defendant Thunen) as a result of their longstanding professional and personal relationship with each other, built upon mutual respect, since at least the early 2000's.

108. Between April 2003 and April 2007, Defendant Palmisano served as President and CEO of IntraLase Corp. ("IntraLase"), which was co-founded by Defendant Kurtz and of which Kurtz served in numerous leadership positions, including as its initial President and CEO. Defendant Thunen also served as CFO of IntraLase from May 2001 until April 2007.

109. Furthermore, between September 2002 and February 2009, Defendant Link served as a director of Advanced Medical Optics, Inc., which is the company that acquired IntraLase in April 2007.

110. As such, Defendants Palmisano, Link, and Kurtz each have longstanding relationships with each other, and with Defendant Thunen, which renders them incapable of considering a demand to sue one another.

**The Insider Trading Defendants**

111. As alleged above, the Insider Trading Defendants (Maniar and Fountain) each sold copious amounts of their personally held common stock while in possession of material, non-public information. Each of the Insider Trading Defendants' sales were timed to maximize profit from the Company's artificially inflated stock price. Accordingly, each of the Insider Trading Defendants face a substantial likelihood of liability for their unlawful insider trading and further obtained a material personal benefit from their insider trading.

112. Because each of the Insider Trading Defendants face a substantial likelihood of liability and reaped a material personal benefit from their unlawful insider trading, none of them can reasonably consider a demand to sue each other. Nor could either of the Insider Trading Defendants reasonably investigate the insider sales committed by each other without bringing attention to their own unlawful insider sales. As such, demand is excused as to each of the Insider Trading Defendants.

**Defendants Kurtz, Corley and Bakker**

113. As alleged herein, upon the materially false and misleading statements in the 2025 Proxy Statement, Company shareholders voted in favor of re-electing Defendants Kurtz, Corley, and Bakker to the Board. Thus, Defendants Kurtz, Corley, and Bakker each received a material personal benefit from the materially false and misleading 2025 Proxy Statement in the form of their continued service on the Board and concomitant compensation and access to inside information. As such, demand is excused as to each of them.

**Defendants Andrews, Fountain and Bakker**

114. Defendants Andrews, Fountain and Bakker, as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Defendants Andrews, Fountain, and Bakker were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.

115. Moreover, Defendants Andrews, Fountain and Bakker reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, Defendants Andrews, Fountain, and Bakker caused these improper statements. Accordingly, Defendants Levin, Andrews, Fountain and Bakker breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, Defendants Andrews, Fountain, and Bakker face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Additional Reasons Demand is Excused**

116. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

117. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

118. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

119. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

120. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

121. Publicly traded companies, such as RxSight, typically carry director and officer liability insurance from which the Company could potentially recover some or

all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

122. Accordingly, each of the Director Defendants, and at least a majority of the Current Directors, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**(Against the Individual Defendants for Breach of Fiduciary Duties)**

123. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

124. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

125. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

126. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose that: (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the

Company's statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

128. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

129. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

130. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

131. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

132. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

133. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

134. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

135. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend their unlawful actions.

136. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

137. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

139. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

140. Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against the Director Defendants for Aiding and Abetting)**

141. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants.

143. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

144. As a result, the Director Defendants substantially assisted the Officer Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

145. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

146. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**SIXTH CAUSE OF ACTION**

**(Against the Insider Trading Defendants for Insider Trading)**

147. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148. By reason of their fiduciary role as officers and directors of the Company, the Insider Trading Defendants specifically owed the Company the highest obligation of due care, good faith, and loyalty.

149. As directors and/or officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

150. When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $460,000.

151. The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

152. As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

**SEVENTH CAUSE OF ACTION**

**(Against the Director Defendants for Violations of § 14(a) of the Exchange Act)**

153. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

154. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or

instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

155. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. § 240.14a-9.

156. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

157. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy Statement filed with the SEC.

158. The 2025 Proxy Statement was used to solicit shareholder votes in connection with the re-election of Defendants Kurtz, Corley, and Bakker to the Board, among other things.

159. The 2025 Proxy Statement was materially false and misleading because it concealed from investors that: (i) the Company was experiencing “adoption challenges” and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company’s statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

160. By choosing to speak about the Company's sales and financial results, the Director Defendants were also required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Director Defendants' failure to disclose the foregoing issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. 17 C.F.R. § 229.303.

161. Further, the 2025 Proxy Statement was false and misleading when it discussed the Board's role in risk oversight because, despite representations to the contrary, the Board was not in fact fulfilling its oversight responsibilities. It was known, or should have been known, to the Director Defendants in the exercise of prudent business judgment that the Board was not exercising adequate risk oversight. As such, the foregoing statement in the 2025 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

162. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading.

163. The materially false and misleading statements contained in the 2025 Proxy Statement misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

164. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against the Individual Defendants and in favor of the Company, for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, and waste of corporate assets;

C. Awarding, against the Director Defendants and in favor of the Company, all damages sustained by the Company as a result of the Director Defendants' aiding and abetting and violations of Section 14(a) of the Exchange Act;

D. Awarding, against the Insider Trading Defendants, disgorgement of all illicitly gained proceeds from their unlawful insider trading;

E. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, removing officers or directors from their positions, or adding officers or directors to the Company as warranted, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and risk management, and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, and otherwise improve the policies and procedures by which the Board manages the business affairs of the Company.

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 10, 2025

M. Anderson Berry (SBN 262879)
*anderson@emeryreddy.com*
Gregory Haroutunian (SBN 330263)
*gregory@emeryreddy.com*
**EMERY | REDDY, PLLC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (916) 995-5968
Fax: (206) 441-9711

Thomas J. McKenna*
Gregory M. Egleston*
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
*tjmckenna@gme-law.com*
*gegleston@gme-law.com*

**Pro Hac Vice forthcoming*

*Attorneys for Plaintiff*